

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

<em>The Jacob K. Javits Federal Building</em><br>
<em>26 Federal Plaza, 37th Floor</em><br>
<em>New York, New York 10278</em>

February 19, 2026

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Joseph D'Ambrosio*, 25 Cr. 317 (PKC)

Dear Judge Castel:

    The Government respectfully submits this memorandum in advance of the February 24, 2026 sentencing for defendant Joseph D'Ambrosio. For the reasons set forth below, the Government respectfully submits that, balancing the nature and seriousness of the offense against the defendant's acceptance of responsibility—including his full confession to his crimes before law enforcement was aware of them—a below-Guidelines sentence of 36 months' imprisonment would be sufficient but not greater than necessary to achieve the purposes of just sentencing.

**I.  Background**

    **A.  The Offense Conduct**

    D'Ambrosio spent his entire career in the finance industry, much of it as a portfolio for hedge funds and family offices. (PSR ¶ 76). In the late 1990s, D'Ambrosio, while working as a portfolio manager, founded Hereford Holdings LLC, a private entity for his friends and family to invest in. Hereford's approximately 19 investors—which included his wife and children—trusted D'Ambrosio, Hereford's manager, to make investments and manage their savings on their behalf. (PSR ¶ 6). In the early 2000s, D'Ambrosio co-founded Investment Adviser A (PSR ¶ 9), and invested Hereford's asserts primarily in Adviser A's hedge funds (PSR ¶ 14).

    By 2010, however, D'Ambrosio began stealing the money his friends and family had invested in Hereford. (PSR ¶ 16). With complete control over Hereford's assets, D'Ambrosio began withdrawing its funds, including from Adviser A, and using the money to maintain the illusion of a comfortable upper-class lifestyle in Westchester County. (PSR ¶¶ 16, 58-59). While D'Ambrosio used the money his friends and family invested with him to cover his mortgage, his taxes, and pay for cars and travel (PSR ¶ 25), he repeatedly sent Hereford's investors false documents, including earnings statements and K-1 tax forms, that stated their investments were safe at Adviser A and growing. (PSR ¶ 17). D'Ambrosio further reassured Hereford's investors individually, through emails and phone calls, all designed to maintain the illusion of fictious portfolio returns that masked the fact that D'Ambrosio had stolen their money. (PSR ¶¶ 17-24).

By 2022, D'Ambrosio had drained the majority of the funds in Hereford, but he continued to represent to investors that their investments were growing. (PSR ¶¶ 21, 25). At the end of that year, D'Ambrosio approached one of Hereford's investors, his wife's stepmother ("Investor-1"), and asked for a $1.5 million loan. D'Ambrosio told her that he wanted to start a new fund but did not want to take money out of the existing funds; Investor-1 agreed and loaned D'Ambrosio the money out of her personal investments (outside of Hereford) in Adviser A. In the fall of 2023, D'Ambrosio borrowed another $300,000 from Investor-1, this time for purportedly unexpected expenses on his home. In actuality, D'Ambrosio used this money, like the Hereford money, to keep the façade of his professional and personal success afloat.

By the end of 2024, D'Ambrosio faced approximately $2 million in redemption requests from Hereford investors that he knew he could not meet. (PSR ¶ 26). At that point, D'Ambrosio, through counsel, contacted the U.S. Attorney's Office, as well as the Securities and Exchange Commission, to confess his crimes and face the consequences. In early 2025, D'Ambrosio met with law enforcement and fully confessed to his crimes, without minimization, obfuscation, or justification.

In total, D'Ambrosio stole approximately $5 million from Hereford investors, plus the additional $1.8 million loan from Investor-1. While some of Hereford's investors were net positive—meaning they received more in distributions from Hereford than they contributed—every investor was tricked into believing their investments through D'Ambrosio had been earning decades of profit through Adviser A's hedge funds that were fictious.

### B. The Defendant's Plea, Guidelines Range, and Forfeiture

On July 17, 2025, the defendant voluntarily surrendered, waived indictment, and was charged by information (the "Information") with one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17. That same day, pursuant to a pre-charge plea agreement, the defendant pled guilty to the single count of the Information. (PSR ¶ 1.)

As agreed to by the parties, and as calculated by the Probation Office, the top end of the Guidelines range, which would otherwise be 57 to 71 months' imprisonment, exceeds the statutory maximum of 60 months' imprisonment, and so the Stipulated Guidelines Range is 57 to 60 months' imprisonment. (PSR ¶ 86.) Probation recommends the defendant be sentenced to a below-Guidelines sentence of 48 months' imprisonment. (PSR at 30.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of approximately $5 million (PSR ¶ 97), for which the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment. (ECF No. 9), and restitution in the amount of $6.8 million, (PSR ¶ 95), for which the Court has entered an order permitting D'Ambrosio to prepay that amount. (ECF No. 25).

**II. The Sentencing Guidelines and Section 3553(a) Factors**

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

**III. The Court Should Impose a Significant, But Below-Guidelines Sentence**

The Government respectfully submits that a sentence of imprisonment below the Stipulated Guidelines Range of 36 months' imprisonment would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

**A. A Significant Incarceratory Sentence Is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment**

A significant incarceratory sentence, albeit one below the Stipulated Guidelines Range, is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant used a Ponzi scheme to steal millions of dollars from his family and close friends. He kept the scheme going for decades, gambling on redemption, all the while receiving

additional contributions from his family members. Close to the end of the scheme, when the defendant was unable to sustain the upper-class lifestyle he had propped up with the now-drained Hereford funds, he went so far as to solicit a $1.8 million loan from an 80-year-old investor, Investor-1, who thought the loan was safe given the millions in fictitious returns the defendant had duped her into believing he had earned through his investments on her behalf. This was a classic fraud with classic motivations—greed, ambition, a desire to keep up appearances, and a hope that he could undo the damage he had caused with additional fraud.

The six victim impact statements speak powerfully to the harm the defendant has inflicted on his victims. For example, Investor-1 writes, "The pain of realizing that we were defrauded is terrible. But the deeper wound is knowing that the fraudster was family — someone we trusted, embraced, celebrated, and supported for years. Joe D's actions have devastated our family emotionally and financially. He betrayed not only me but his wife, children, grandchildren, my late husband, my late husband's sister, brother-in-law, close friends, and colleagues. The ripple effects of his deception continue to reverberate across our family."

Another victim writes, "My grandmother transferred her investment into a trust for the benefit of her five grandchildren in 2023, intending for us to use the money for education for her eight great-grandchildren and for other needed expenses. When I stepped into the role of trustee in 2023, the fund was valued by Joe D'Ambrosio at over $6.27 million…. I know practically we are never getting the money back that was stolen, much less the interest on that money. While I don't believe I ever deserved such a generous gift from my grandmother, she nevertheless worked hard to save and invest that money and it was her money to give, not Joe D'Ambrosio's."

A third writes, "In learning the money was stolen ($105,000), the gift of time and security was taken away. The account that would go towards retirement had never held money (stolen before it was invested) and the Trust which once had been in existence was empty. Money I was counting on, until the past year, to pay for my graduate degree disappeared. Walking into a clinical psychology program knowing I would have the funds to pay for it, only to find out I didn't, required a massive shift for me. While I am in the fortunate position to be able to continue with my degree, the freedom and security my grandmother had gifted me was gone."

Multiple victims expressed frustration at the five-year maximum sentence D'Ambrosio faces and ask this Court to impose the maximum sentence.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. Justice requires that D'Ambrosio be punished with a significant incarceratory sentence.

## B. Deterrence Warrants a Significant Incarceratory Sentence

While, given the defendant's full confession and acceptance of responsibility, the need for specific deterrence weighs less importantly here, general deterrence further supports the imposition of a significant incarceratory sentence. The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, especially Ponzi schemes, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013)

(quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

For those reasons, it is important here to impose a sentence that will deter investment advisor fraud and Ponzi schemes. While a "relatively modest prison term" may be sufficient in some cases, non-incarceratory sentences "totally fail to send this message." *United States Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).

### C. The Defendant's Confession, Personal Characteristics, and the Need To Pay Restitution Militate Towards a Below-Guidelines Sentence

To be sure, unlike many Ponzi scheme cases, there are several factors in this case that warrant leniency. For starters, Hereford was not a fraud from its inception. As the defendant's sentencing submission explains in detail, this fraud falls into the category of those where a defendant "falls behind" where he expected to be for a legitimate investment and lies to try to cover his failure, hoping to be able to cover his losses in the future. Like many Ponzi schemes, he never did.

More importantly, the defendant brought his crimes to the attention of law enforcement before anyone knew about them. He confessed fully and without reservation, thereby obviating the need for a full investigation or trial. His decision to come forward and confess is admirable, even if it came on the eve of knowing he had run out of runway and would soon be caught.

The collateral consequences of his conduct are profound. It is a rare case where a prosecutor can say that a defendant likely cares less about prison time than the other impacts his crimes have had on his life. This is one of those rare cases. By abusing the trust of his immediate family and closest friends, the defendant finds himself divorced, out of his home, ostracized from those who loved him dearest are hurt most of all, with his professional career and reputation in tatters.

The defendant has expressed commitment to pay back the victims of his crimes, going so far as to ask for a judicial order to prepay restitution even prior to sentencing, an unusual ask that again should redound to his benefit and his full acceptance of responsibility. Prison time, while

necessary in this case, will likely slow the defendant's efforts to attempt to repay the friends and family who are the victims of his crimes.

### D. A Significant Incarceratory Sentence Is Also Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability also warrants a substantial incarceratory sentence, albeit one below the Guidelines range. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Here, when comparing the defendant's case to other Ponzi scheme defendants in this District, the need to avoid unwarranted sentencing disparities requires the imposition of a significant incarceratory sentence. Ponzi scheme defendants are generally sentenced to serious prison time. *See, e.g.*, *United States v. Barry*, 502 F. App'x 85 (2d Cir. 2012) (affirming 20-year sentence for $27 million Ponzi scheme run over 6 years harming over 250 victims); *United States v. Eisner*, 431 F. App'x 23 (2d Cir. 2011) (affirming 188-month sentence for $66 million Ponzi scheme); *United States v. Regensberg*, 381 F. App'x 60 (2d Cir. 2010) (affirming 100-month sentence for Ponzi scheme).

While the defendant asks for a sentence of a year and a day and a year of home confinement, such a significant discount to the range of expected outcomes is not warranted solely because he came forward and confessed his crimes before law enforcement found him. For example, in *United States v. Breeman*, the defendant there, like here, walked into the U.S. Attorney's Office and self-reported his culpability for a Ponzi real-estate scheme of a similar scale—approximately $13 million in investor losses across 30 victims. 25 Cr. 211 (GHW). Judge Woods sentenced the defendant, consistent with the Government's and Probation's recommendations, to 36 months' imprisonment, below the Guidelines range of 51 to 63 months' imprisonment.

Balancing these factors, and including the views of the victims and Probation, the Government submits that a sentence of 36 months' imprisonment is appropriate.

## IV.  Conclusion

For the reasons set forth above, the Government respectfully submits that a below-Guidelines sentence of 36 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____/s/_____
Matthew R. Shahabian
Assistant United States Attorney
(212) 637-1046